IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 67523-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| WILLIAM LAU, | ) | |
| | ) | |
| Appellant. | ) | FILED: May 20, 2013 |

SCHINDLER, J. — The Gambling Act of 1973, chapter 9.46 RCW, authorizes cities to tax pull-tab game operators at a rate not to exceed five percent of gross gambling receipts. The Washington State Gambling Commission licensed the "Lau Family Living Trust" to operate pull-tab games at the bars it owned in the city of Burien and the city of Federal Way. William Lau underreported the amount of gross gambling receipts for pull-tab sales. The State charged Lau with theft in the first degree of "property belonging to the City of Federal Way" and theft in the second degree of "property belonging to the City of Burien." Because the State did not prove beyond a reasonable doubt that Lau obtained control over the property of another or a superior interest in the gross gambling receipts, we reverse.

FACTS

In 2000, William Lau and his spouse Josephine Lau established the Lau Family Living Trust (Trust). William and Josephine are designated as the sole trustees. The Trust formed TLF Holdings LLC and Tall Timbers Enterprise LLC. The Trust is the sole owner and William Lau is designated as the manager of TLF Holdings and Tall Timbers Enterprise. TLF Holdings purchased BZ's Sports Bar & Grill located in the city of Burien. Tall Timbers Enterprise purchased Tall Timbers Tavern located in the city of Federal Way and Good Time Ernie's in the city of Burien.

The Washington State Gambling Commission (Gambling Commission) licensed the three bars to operate pull-tab games. State law requires pull-tab licensees to submit a detailed monthly income summary for all pull-tab sales and gross gambling receipts from the operation of the games to the Gambling Commission.[1] Pull-tab operators must also submit quarterly activity reports to the Gambling Commission.[2] The Gambling Commission has the authority to inspect and audit the records of a licensee to ensure compliance.[3]

Each page of the monthly income summary has a column to record 16 pull-tab games and compute gross gambling receipts based on the "Size of the Game," "Number Not Sold," "Number Played," and "Cost Per Play" before listing "Cash Prizes," the "Net Gambling Receipts," "Actual Cash Count," and "Cash Over or (Short)." Each page also records the total gross receipts for all pull-tab games listed on that page. The final page records the calculation of the "grand total" of the gross gambling receipts for

---

[1] WAC 230-14-280 (formerly WAC 230-30-072), -285 (formerly WAC 230-08-010 [in part]); WAC 230-06-070 (formerly WAC 230-08-010 [in part]).

[2] WAC 230-14-284 (formerly WAC 230-08-130).

[3] RCW 9.46.130.

that month. The quarterly activity report records the total gross receipts for all pull-tab games, as well as the local gambling taxes for that period.

By ordinance, the city of Burien imposed a tax of five percent on the gross gambling receipts from the operation of pull-tab games. The city of Federal Way also imposed a five percent tax on pull-tab operators based on gross gambling receipts.

In March 2010, Gambling Commission Special Agent Jess Lohse reviewed the monthly income summaries prepared and signed by Lau for BZ's Sports Bar & Grill. Special Agent Lohse discovered the grand total for the gross gambling receipts recorded in October, November, and December 2009 did not match the gross gambling receipts recorded in the fourth quarter activity report. The discrepancy between the monthly income summaries and the fourth quarter activity report showed that Lau underreported gross gambling receipts by $15,301.

Special Agent Lohse conducted an audit of the monthly income summaries, the quarterly activity reports, and the gambling tax returns submitted by Lau for BZ's Sports Bar & Grill and Good Time Ernie's from 2006 through 2009, and for Tall Timbers Tavern from mid-2005 through 2009. Special Agent Lohse determined that Lau underreported gross receipts from the operation of pull-tab games by $85,038.00 for BZ's Sports Bar & Grill, $14,920.25 for Good Time Ernie's, and $235,479.50 for Tall Timbers Tavern.

In the "Certification for Determination of Probable Cause" (Certification), Special Agent Lohse sets forth a detailed description of the investigation and audit of the records submitted by Lau for BZ's Sports Bar & Grill, Tall Timbers Tavern, and Good Time Ernie's. The Certification states, in pertinent part:

> 5. After obtaining each licensee's monthly records, I tested the mathematical accuracy of each page contained in a given month. I found

3

a total of 128 discrepancies. I determined that all 128 discrepancies noted were the result of LAU intentionally and deliberately falsifying totals recorded on monthly record pages. I found no other intentional or deliberate discrepancies caused by employees other than LAU. LAU almost always underreported by whole dollar amounts. In cases where LAU did not underreport by whole dollar amounts, there were other factors involved. . . .

. . . .

7. After reviewing each licensee's monthly records, I compared the total gross receipts I determined by review of the monthly records to quarterly activity reports submitted to the Commission and gambling tax returns submitted to the local taxing authority. I determined that between 2006 and 2009, a total of 39 quarterly activity reports [(QAR)] and 39 gambling tax returns were falsified by LAU. I noted that LAU completed every QAR submitted to the Commission from 2006 through 2009. I also noted that LAU completed every gambling tax return submitted to the local taxing authority from 2006 through 2009. . . .

8. During the investigation, I also determined that LAU put many pull-tab games in play and the games generated revenue. However, LAU failed to record the revenue brought in for the games on monthly records, QAR's, and gambling tax returns.

In the Certification, Special Agent Lohse concludes there was probable cause that Lau committed the crimes of "Forgery, RCW 9A.60.020, a Felony; Offering False Instrument for Filing or Record, RCW 40.16.030, a Felony; False or Misleading Entries or Statements, RCW 9.46.170, a Gross Misdemeanor; and Violations Relating to Fraud or Deceit, RCW 9.46.190, a Gross Misdemeanor."

The State charged Lau with one count theft in the first degree and one count of theft in the second degree.[4] Lau denied intentionally underreporting or falsifying the gross gambling receipts. The defense argued that the calculation of gross gambling receipts does not include pull-tab tickets that were lost, stolen, or mistakenly counted.

A number of witnesses testified at trial, including Special Agent Lohse; two employees who worked at BZ's Sports Bar & Grill, Good Time Ernie's, and Tall Timbers

---

[4] Lau entered into a consent order with the Gambling Commission.

Tavern, Colleen Schroeder and Kathleen O'Neill; the finance analyst for Federal Way; and the accounting manager for Burien.

Special Agent Lohse testified at length about the audit and calculation of gross gambling receipts. The Burien accounting manager, Gary Coleman, testified that the city's gambling tax was based on "each dollar received" for pull-tab games. The Federal Way finance analyst, Phung Huynh, testified that Federal Way imposed a five percent tax on gross gambling receipts.

Schroeder testified that employees often made errors in entering information or mixing pull-tab receipts from one game with a different game. Schroeder also testified that employees and customers sometimes stole pull-tabs. Schroeder and O'Neill each testified that Lau prepared the monthly gross income gambling receipt summaries, the quarterly activity reports, and the gambling tax returns, and identified Lau's signature on the reports.

The jury convicted Lau as charged of theft in the first degree and theft in the second degree.

## ANALYSIS

Lau contends the State did not meet its burden of proving an essential element of the crime of theft. Lau asserts the State did not prove that he wrongfully obtained "the property of another." The State claims it proved beyond a reasonable doubt that the cities had an ownership interest in five percent of the gross gambling receipts for BZ's Sports Bar & Grill, Tall Timbers Tavern, and Good Time Ernie's.

The State has the burden to prove the elements of the crime charged beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368

5

(1970); State v. Borrero, 147 Wn.2d 353, 364, 58 P.3d 245 (2002). Under the Fourteenth Amendment and the Sixth Amendment of the United States Constitution, and article 1, section 21 of the Washington State Constitution, a criminal defendant is entitled to " 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)[5] (quoting United States v. Gaudin, 515 U.S. 506, 510, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995)); State v. Abrams, 163 Wn.2d 277, 285, 178 P.3d 1021 (2008).

Under the Gambling Act of 1973, chapter 9.46 RCW (Gambling Act), the State is designated as the exclusive authority for regulating gambling activity. RCW 9.46.285 states:

> This chapter constitutes the exclusive legislative authority for the licensing and regulation of any gambling activity and the state preempts such licensing and regulatory functions, except as to the powers and duties of any city, town, city-county, or county which are specifically set forth in this chapter. Any ordinance, resolution, or other legislative act by any city, town, city-county, or county relating to gambling in existence on September 27, 1973 shall be as of that date null and void and of no effect. Any such city, town, city-county, or county may thereafter enact only such local law as is consistent with the powers and duties expressly granted to and imposed upon it by chapter 9.46 RCW and which is not in conflict with that chapter or with the rules of the commission.

The legislature gives municipalities the authority to adopt ordinances to tax pull-tab operators based on five percent of gross gambling receipts. RCW 9.46.110 provides, in pertinent part:

> (1) The legislative authority of any county, city-county, city, or town, by local law and ordinance, and in accordance with the provisions of this chapter and rules adopted under this chapter, may provide for the taxing of any gambling activity authorized by this chapter within its jurisdiction,

---

[5] (Alteration in original.)

the tax receipts to go to the county, city-county, city, or town so taxing the activity. . . .

. . . .

(3)(e) . . . At the option of the county, city-county, city, or town, the taxation of punchboards and pull-tabs for commercial stimulant operators[6] may be based on gross receipts from the operation of the games, and may not exceed a rate of five percent, or may be based on gross receipts from the operation of the games less the amount awarded as cash or merchandise prizes, and may not exceed a rate of ten percent.[7]

The Gambling Act identifies a number of criminal offenses, including making a false or misleading statement or entry in the mandatory reports that the pull-tab operator must submit and maintain. For example, under RCW 9.46.170, it is a gross misdemeanor to make a false or misleading statement or "misleading entry" in any record maintained for or report submitted to the Gambling Commission.[8] And under RCW 9.46.190, it is a gross misdemeanor for "[a]ny person or association or organization operating any gambling activity" to:

(1) Employ any device, scheme, or artifice to defraud; or
(2) Make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statement made not misleading, in the light of the circumstances under which said statement is made; or

---

[6] Under RCW 9.46.0217, a "commercial stimulant" is an activity "operated in connection with an established business, with the purpose of increasing the volume of sales of food or drink for consumption on that business premises."

[7] Former RCW 9.46.113 (1975) states:

Any county, city or town which collects a tax on gambling activities authorized pursuant to RCW 9.46.110 shall use the revenue from such tax primarily for the purpose of enforcement of the provisions of this chapter by the county, city or town law enforcement agency.

The legislature amended RCW 9.46.113 in 2010. LAWS OF 2010, ch. 127, § 6. As amended, RCW 9.46.113 states that a city "must" use the revenue from taxes received from gambling activities for "public safety."

[8] RCW 9.46.170 states, in pertinent part:

Whoever, in any . . . book or record required to be maintained by the commission or in any report required to be submitted to the commission, shall make any false or misleading statement, or make any false or misleading entry or willfully fail to maintain or make any entry required to be maintained or made, . . . shall be guilty of a gross misdemeanor subject to the penalty set forth in RCW 9A.20.021.

(3) Engage in any act, practice or course of operation as would operate as a fraud or deceit upon any person.

As part of the Gambling Act, the legislature gives municipalities the authority to enact an ordinance making violations of the Gambling Act a misdemeanor or gross misdemeanor. RCW 9.46.192 provides:

> Every city or town is authorized to enact as an ordinance of that city or town any or all of the sections of this chapter the violation of which constitutes a misdemeanor or gross misdemeanor. The city or town may not modify the language of any section of this chapter in enacting such section except as necessary to put the section in the proper form of an ordinance or to provide for a sentence be served in the appropriate detention facility. The ordinance must provide for the same maximum penalty for its violation as may be imposed under the section in this chapter.

In addition, the Gambling Act authorizes the imposition of a lien for delinquent gambling taxes on personal and real property used "in the gambling activity." RCW 9.46.110(4). The Gambling Act also authorizes municipalities to bring collection actions for delinquent taxes. RCW 9.46.350 states:

> At any time within five years after any amount of fees, interest, penalties, or tax which is imposed pursuant to this chapter, or rules adopted pursuant thereto, shall become due and payable, the attorney general, on behalf of the commission, may bring a civil action in the courts of this state, or any other state, or of the United States, to collect the amount delinquent, together with penalties and interest: PROVIDED, That where the tax is one imposed by a county, city or town under RCW 9.46.110, any such action shall be brought by that county, city or town on its own behalf. An action may be brought whether or not the person owing the amount is at such time a licensee pursuant to the provisions of this chapter.
> If such an action is brought in the courts of this state, a writ of attachment may be issued and no bond or affidavit prior to the issuance thereof shall be required. In all actions in this state, the records of the commission, or the appropriate county, city or town, shall be prima facie evidence of the determination of the tax due or the amount of the delinquency.

As authorized by the Gambling Act, the city of Burien adopted Burien Municipal Code (BMC) 3.25.010 to impose on pull-tab operators a tax on five percent of gross gambling receipts from pull-tab games. BMC 3.25.010 provides, in pertinent part:

> There is hereby imposed a tax, at the rates set forth below, upon the following gambling activities, when authorized by Chapter 9.46 RCW, and when conducted in the city:
>      (1) Five percent of the gross receipts from punchboards and pull-tabs, as those terms are defined by RCW 9.46.0273 and the Rules and Regulations of the Gambling Commission.

The city of Federal Way also adopted a code provision imposing a five percent tax on the gross receipts from pull-tab games. Former Federal Way City Code (FWCC) 14-144 (2002)[9] states, in pertinent part:

> (a) In accordance with RCW 9.46.110, there is levied upon all persons a tax on every gambling activity permitted by this division at the following rates:
>      . . . .
>      (3) . . . . Taxation of punchboards or pull-tabs for commercial stimulant operators shall be at a rate of five percent on gross receipts from the operation of the games.

Here, the State charged Lau with one count of theft in the first degree of "U.S. Currency . . . belonging to the City of Federal Way" and one count of theft in the second degree of "U.S. Currency . . . belonging to the city of Burien." The State alleged that with intent to deprive the cities of property, Lau obtained unauthorized control over "U.S. Currency" belonging to the cities "by color and aid of deception." The information alleged as follows:

COUNT I
I, Daniel T. Satterberg, Prosecuting Attorney for King County in the name and by the authority of the State of Washington, do accuse

---

[9] We note that the FWCC was "re-codif[ied], reorganize[d], and republish[ed]" as the Federal Way Revised Code (FWRC) in 2009, and FWCC 14-144 was recodified as FWRC 3.40.040. See Federal Way Resolution 09-539 (Jan. 6, 2009); Federal Way Ordinance (FWO) 02-422 (Sept. 17, 2002).

WILLIAM LAU of the crime of **Theft in the First Degree**, committed as follow[s]:

That the defendant WILLIAM LAU, in King County, Washington, during a period of time intervening between July 1, 2005, through January 31, 2010, with intent to deprive another of property, to wit: U.S. Currency, having a value in excess of $5,000, did obtain control over such property belonging to the City of Federal Way, by color and aid of deception, and did exert unauthorized control over such property;

Contrary to RCW 9A.56.030(1)(a) and 9A.56.020(1)(a), (b), and against the peace and dignity of the State of Washington.

COUNT II

And I, Daniel T. Satterberg, Prosecuting Attorney aforesaid, further do accuse WILLIAM LAU of the crime of **Theft in the Second Degree**, a crime of the same or similar character as another crime charged herein, which crimes were part of a common scheme or plan and which crimes were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the other, committed as follows:

That the defendant WILLIAM LAU, in King County, Washington, during a period of time intervening between January 1, 2006, through January 31, 2010, with intent to deprive another of property, to wit: U.S. Currency, did obtain control over such property belonging to the City of Burien, by color and aid of deception, and did exert unauthorized control over such property; that the value of such property did exceed $750.

Contrary to RCW 9A.56.040(1)(a) and 9A.56.020(1)(a), (b), and against the peace and dignity of the State of Washington.

To convict Lau of theft, the State had the burden of proving beyond a reasonable doubt that with the intent to deprive, he either wrongfully obtained and exerted unauthorized control, or by color and aid of deception obtained control over the property of the city of Federal Way and the city of Burien. RCW 9A.56.020(1)(a), (b).

RCW 9A.56.020(1) defines the crime of "theft" as follows:

> (a) To wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services; or
> (b) By color or aid of deception to obtain control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services.

10

The meaning of "property of another" is derived from the definition of "owner." State v. Pike, 118 Wn.2d 585, 589, 826 P.2d 152 (1992). The definition of "owner" "establishes the level of interest necessary to claim a right to property." Pike, 118 Wn.2d at 589. The statute defines "owner" as "a person, other than the actor, who has possession of or any other interest in the property or services involved, and without whose consent the actor has no authority to exert control over the property or services." RCW 9A.56.010(11).[10]

Lau relies on Pike to argue the State did not prove the cities had a property interest in the gross gambling receipts from pull-tab sales. The court in Pike held that in order "to constitute the property of another, the item must be one in which another person has an interest, and the defendant may not lawfully exert control over the item absent the permission of that other person." Pike, 118 Wn.2d at 590. The court also held that an owner could commit theft of property he had legal title to if the State proved there was another superior possessory interest in the property.

> [E]ven where a person possesses legal title to a given item, theft can occur if that person takes the item from another who has a superior possessory interest. Liens, pledges, and bailments all have the potential to satisfy the theft statute by creating a superior possessory interest in another as against the owner of the item.

Pike, 118 Wn.2d at 590.

The court in Pike concluded that because the mechanic did not comply with the statutory lien provisions of the Automotive Repair Act, chapter 46.71 RCW, the owner's failure to pay for repairs resulted in an unsecured contractual claim but not a

---

[10] We note the legislature renumbered the subsections of RCW 9A.56.010 in 2011. LAWS OF 2011, ch. 164, § 2. Because the definition of "owner" did not change, we cite to the statute currently in effect.

11

possessory interest that would support a theft conviction. Pike, 118 Wn.2d at 594-95.

> As with all nonsecured contractual debts, the debt Pike owes [the mechanic] for the cost of repairs is a personal debt; it is not chargeable to any particular piece of property. State v. Polzin, 197 Wash. 612, 618, 85 P.2d 1057 (1939).
> Such a general contractual debt cannot support a theft conviction. First, it does not satisfy the "property of another" element because [the mechanic] has no possessory interest in the car, only a right to recover damages from Pike in a civil lawsuit. Second, mere breach of a contractual obligation to pay does not create criminal liability absent a specific statute, or contractual fraud.

Pike, 118 Wn.2d at 595.

Here, the State did not present any evidence that Lau could not lawfully exert control over the gross gambling receipts without the permission of the cities or that the cities had a superior possessory interest in the gross gambling receipts. The only evidence the State presented to establish an ownership interest in the gross gambling receipts was the testimony of Huynh, the financial analyst for the city of Federal Way, and Coleman, the accounting manager for the city of Burien.

Huynh testified that Federal Way taxed pull-tab gross gambling receipts at five percent, did not allow deductions, and that gross gambling receipts did not include "bounced checks or stolen things." Likewise, Coleman testified that Burien imposed a tax of five percent on each dollar received for the sale of pull-tabs.

> If it's a $1 pull-tab and an individual comes in and buys one, the tax on that would be five percent, which would become -- be coming to the City. So five percent of each dollar received on the sale of pull-tabs.

Relying heavily on State v. Monk, 42 Wn. App. 320, 711 P.2d 365 (1985), the State argues that Lau obtained control over the property of the cities by

"creat[ing] . . . a false impression of what that five percent figure was" and "[taking] control of the cities' right to payment of the tax bill." Monk does not support the State's argument.

In Monk, a jury convicted a city employee of theft by deception. The employee transferred her utility account to a file designated for customers in bankruptcy to avoid paying her bill. Monk, 42 Wn. App. at 321. On appeal, the court rejected the employee's argument that the State failed to prove she exerted unauthorized control over the property of another. Monk, 42 Wn. App. at 323. Identifying the property as the city's account receivable, the court held that the defendant "effectively obtained control over the City's right to payment by 'hiding' her account." Monk, 42 Wn. App. at 322-23. The court affirmed the conviction for theft by deception on the grounds that the account receivable was not "lawfully in [the employee's] possession."

> The property here—the account receivable—was not lawfully in Ms. Monk's possession. In order to transfer her account, office procedure required her to secure the signed approval of one of her supervisors. She did not do so. These circumstances are sufficient to constitute . . . proof of theft by deception.

Monk, 42 Wn. App. at 323. Unlike in Monk, there is no evidence in this case that the gross gambling receipts constituted an account receivable or that either the city of Federal Way or the city of Burien had an ownership interest in the gross gambling receipts.

The State also cites Porcelli v. United States, 303 F.3d 452 (2nd Cir. 2002), for the proposition that the cities' right to payment establishes ownership under the theft statute. Porcelli is inapposite.

In Porcelli, the defendant was convicted of filing fraudulent New York State sales

13

tax returns for gas stations owned by his corporations under the federal mail fraud statute, 18 U.S.C. section 1341, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. section 1962(c). Porcelli, 303 F.3d at 453. On appeal, the defendant argued that because uncollected and unremitted sales taxes were not the property of the state under New York law, there was no basis for his mail fraud conviction. Porcelli, 303 F.3d at 453. In affirming the conviction, the court specifically points out that the defendant was not charged with theft of the state's property but with "underreporting a sales tax obligation so as to reduce his payment of sales taxes" in violation of the mail fraud statute's prohibition on " 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses.' " Porcelli, 303 F.3d at 456-57 (quoting 18 U.S.C. § 1341).

Finally, the State argues in passing that the city of Burien and the city of Federal Way had a superior possessory interest in the gross gambling receipts under RCW 9.46.110(4). But the State charged Lau with theft of "U.S. Currency" belonging to the cities. The State did not charge Lau with theft of "personal and real property used in the gambling activity," and presented no evidence that the cities had a lien. RCW 9.46.110(4). RCW 9.46.110(4) provides:

> Taxes imposed under this chapter become a lien upon personal and real property used in the gambling activity in the same manner as provided for under RCW 84.60.010.[11] The lien shall attach on the date the tax

---

[11] RCW 84.60.010 provides:

All taxes and levies which may hereafter be lawfully imposed or assessed shall be and they are hereby declared to be a lien respectively upon the real and personal property upon which they may hereafter be imposed or assessed, which liens shall include all charges and expenses of and concerning the said taxes which, by the provisions of this title, are directed to be made. The said lien shall have priority to and shall be fully paid and satisfied before any recognizance, mortgage, judgment, debt, obligation or responsibility to or with which said real and personal property may become charged or liable.

14

becomes due and shall relate back and have priority against real and personal property to the same extent as ad valorem taxes.

Because the State did not prove that Lau wrongfully obtained the property of another or a superior interest in the gross gambling receipts, we reverse.

Schindler, J.

WE CONCUR:

Leach, C.J.

Becker, J.