IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 30032-3-III |
| | ) | |
| v. | ) | |
| | ) | |
| KIMBERLY LYNN GRIJALVA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — Kimberly Grijalva challenges her convictions for second degree theft and third degree introduction of contraband, arguing that the charging document was defective and the evidence insufficient to support the charges. We disagree and affirm.

## FACTS

Ms. Grijalva worked as an attorney in Yakima. Part of her practice was criminal defense; she maintained an office out of her home. She set up her home telephone as an attorney line that could accept free and unrecorded telephone calls from the Yakima County Jail (YCJ). Also living in her house for a time was a woman named Autumn Scribner.[1] While living in Ms. Grijalva's house, Ms. Scribner dated two men who were inmates in the county jail.

---

[1] Ms. Scribner is also referred to in the record as Autumn Hubbard. We will use the surname Scribner for purposes of this opinion as that is the name used in the bench findings.

Inmates at the YCJ had to use a calling service to place phone calls. A call made to an attorney was free; other calls cost $2.50 per 15 minutes. The calling service was provided by Inmate Calling Solutions (ICS), which split the telephone call revenue equally with the YCJ.

In a 40-day period between April and June of 2010, the two inmates whom Ms. Scribner was seeing completed 916 telephone calls to Ms. Grijalva's house on her free attorney line. She did not represent either man. Many of the phone calls were forwarded to Ms. Scribner's cell phone. Ms. Grijalva was aware of the calls on her office line. A federal investigation of one of the men led to the discovery of the phone calls. The YCJ arranged to have the calls recorded. Review of the calls revealed Ms. Grijalva participating in some of them and otherwise present for many of the calls.

In a separate incident that October, Ms. Grijalva visited inmate Calvin George at the YCJ to discuss undertaking his representation. The visit occurred in a professional visiting room at the jail. Ms. Grijalva slid her telephone to Mr. George through a pass-through window so that he could place a phone call to his mother about paying Ms. Grijalva to represent him. The action was noted by corrections staff.

The Yakima County Prosecutor's Office filed charges against Ms. Grijalva of second degree theft, based on the free telephone calls made by the two inmates, and third degree introduction of contraband for passing her cell phone to Mr. George. The theft count listed the Yakima County Department of Corrections as the victim of a theft of

2

telephone services. The theft count later was amended to add a theory of accomplice liability.

Ms. Grijalva waived her right to a jury trial and the matter proceeded to trial before a visiting judge, the Honorable Brian Altman. Ms. Scribner testified with immunity and stated that Ms. Grijalva encouraged use of the phone line for the personal calls and set up the forwarding of the calls to Ms. Scribner's cell phone.

At the conclusion of the State's case, the defense moved to dismiss the theft charge, alleging that the charging document failed to state a crime. The trial court denied the motion. The defense argued the theft charge to the bench on theories that there was no crime stated in the charging document and that Ms. Scribner was the person responsible for the telephone calls. After hearing argument, the court found Ms. Grijalva guilty as charged. The court expressly found that she had aided Ms. Scribner and her boyfriends in circumventing the YCJ telephone policy, resulting in a loss to the jail of over $750. Written findings in support of the judgment were entered.

The court imposed a total sentence of 60 days on the two counts and converted that time to 480 hours of community service. Standard financial obligations were imposed, and the court also ordered restitution of $2,290, with $1,145 to ICS and $1,145 to YCJ. Ms. Grijalva then timely appealed to this court.

ANALYSIS

On appeal, Ms. Grijalva renews her challenge to the charging document and also

challenges the sufficiency of the evidence to support both convictions as well as the

evidentiary basis for the finding that she could afford to pay her legal financial

obligations (LFOs). We address the issues in the order stated.

*Charging Document*

Ms. Grijalva argues that the charging document failed to state a theft charge

because "telephone services" are not "property." We disagree.

The standards governing review of this challenge are long settled. A charging

document must state the elements of the alleged crime in order to give the accused an

understanding of the crime charged. "All essential elements of a crime, statutory or

otherwise, must be included in a charging document in order to afford notice to an

accused of the nature and cause of the accusation against him." *State v. Kjorsvik*,

117 Wn.2d 93, 97, 812 P.2d 86 (1991). When challenged for the first time after a verdict

has been returned, courts will liberally construe the document to see if the necessary facts

can be found. If not, the charge will be dismissed without prejudice. Even if the charge

is stated, a defendant who shows prejudice from "inartful" pleading also receives a

dismissal of charges without prejudice. *Id.* at 105-06. The liberal construction standard

for documents that are not timely challenged in the trial court is designed to discourage

"sandbagging" by which the defense withholds a challenge that could otherwise be timely remedied. *Id.* at 103.

Second degree theft requires proof that the defendant committed theft of "property or services" other than a firearm valued at more than $750. RCW 9A.56.040(1)(a). "'Services' includes, but is not limited to, labor, professional services, transportation services, electronic computer services . . . and the supplying of commodities of a public utility nature such as gas, electricity, steam, and water." RCW 9A.56.010(15).

The amended information here alleged that Ms. Grijalva:

> acting as a principal or an accomplice, you or an accomplice wrongfully obtained and/or exerted unauthorized control over property, telephone services, of a value exceeding $750.00 but not more than $5,000.00, which was not a firearm or motor vehicle, belonging to Yakima County Department of Corrections, with intent to deprive Yakima County Department of Corrections of that property.

Clerk's Papers (CP) at 10.

Ms. Grijalva argues that telephone services are not "property" under the noted definition of "services" listed in the preceding paragraph and that her view is further supported by the existence of the crime of theft of telecommunication services, RCW 9A.56.262, that makes it a crime to use a telecommunication device to obtain telecommunication services without paying for them. We do not believe the existence of the telecommunications theft statute furthers Ms. Grijalva's argument here. That statute only addresses thefts committed by use of a *telecommunication device*, an object that is

5

capable of "transmitting or receiving telephonic or electronic communications."

RCW 9A.56.010(19)(a). It involves only a particular *method* of theft that is not

applicable to the facts of this case.

The telecommunications theft statute is instructive, however, on the meaning of

"services." The previously quoted definition of "services" is, by the express language

of the statute, non-exclusive. RCW 9A.56.010(15). The definition of

"telecommunication service" clearly places telephone calls in the category of "services."

RCW 9A.56.010(20). The legislature, having defined telephone calls as a service,

recognized them as something that can be stolen. We thus have no difficulty concluding

that telephone calls are a "service" under the general theft statutes. As telephone calls are

an item that can be stolen, the charging document did state a crime when it alleged that

Ms. Grijalva had stolen telephone services.

The remaining question under *Kjorsvik* is whether, despite charging an offense,

the use of "inartful" language prejudices the defendant. Here, the charging document

expressly stated that the crime involved the taking of "property, telephone services." Ms.

Grijalva contends that the telephone calls were not "property," but does not persuasively

argue that she was prejudiced by the use of the word in the charging document. She

clearly was prepared to address the issue, having brought a motion to dismiss at the end

of the State's case, and then renewing the contention during closing argument. Far from

being confused or prejudiced by the charging language, Ms. Grijalva made it a central

6

part of her defense of the case. Both parties knew the basis for the theft charge and disputed whether those facts constituted a crime. There was no prejudice from describing the telephone calls as "property."

The amended information stated the crime of second degree theft. There was no prejudice from stating that "telephone services" constituted "property." Thus, the charging document was sufficient.

*Sufficiency of the Evidence*

Ms. Grijalva next argues that the evidence was insufficient to support the bench verdicts on both counts. Properly viewed, the evidence supported the verdicts.[2]

Well settled standards again apply to this challenge. The question presented is whether there was evidence from which the trier of fact could find each element of the offense was proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980). The reviewing court will consider the evidence in a light most favorable to the prosecution. *Id.*

---

[2] Appellant assigns error to findings of fact nos. 12, 13, and 43 involving the evidence supporting the two convictions, as well as several conclusions of law regarding the sufficiency of the evidence. As she does not argue that the evidence does not support the challenged findings (an argument that we would reject as each of them was supported by the testimony), we presume the challenges are the legal efficacy of the facts and treat these assignments of error as subsumed in her legal argument. The dissent confuses the policy mentioned in finding 43. The finding addresses the written YCJ policy concerning inmate telephone calls applicable to those people mentioned in the finding rather than an unwritten attorney phone policy.

*Theft Charge*. Ms. Grijalva argues[3] that the evidence does not support this count

because (a) she did not exercise "wrongful" or "unauthorized" control over the telephone

calls and (b) the service did not belong to the Yakima County Department of Corrections,

the named victim. We address each argument in turn.

A person commits theft when she does "wrongfully obtain or exert unauthorized

control over the property or services of another." RCW 9A.56.020(1)(a) (partial). Ms.

Grijalva contends there was nothing improper about her use of the telephone services

because, as an attorney, she was authorized to set up the free telephone line. This argument

proves too much. The purpose of the free attorney telephone service is to facilitate the

attorney-client relationship and the ability to present a defense by allowing an inmate

unfettered access to his attorney. Instead, Ms. Grijalva used the service to provide her

friend, Ms. Scribner, with free telephone calls with her boyfriend(s), circumventing the pay

per use service for personal telephone calls applicable to the other YCJ inmates. This

abuse of the free attorney line certainly was both unauthorized and wrongful.

Her other argument fares no better. The theft statute does not require that there

be a named victim, but only that the theft involved the property "of another." *Id.*

---

[3] In contrast, the dissent makes an argument not presented by Ms. Grijalva in this court or the trial court (and contrary to RAP 12.1) by focusing on the fact that there was no express limitation on *her* use of the attorney line. However, Ms. Grijalva was charged and convicted as an *accomplice* to the inmates' efforts to evade the phone use policy applicable to them rather than for abusing an unwritten policy concerning attorney lines. Report of Proceedings at 787.

*State v. Lee*, 128 Wn.2d 151, 158, 904 P.2d 1143 (1995); *State v. Jefferson*, 74 Wn.2d 787, 790, 446 P.2d 971 (1968); *State v. Easton*, 69 Wn.2d 965, 967-68, 422 P.2d 7 (1966). A representative of ICS testified at trial concerning the telephone system, the cost of $2.50 per telephone call paid by inmates, and how ICS would then split that sum with the jail for each paid call. The State clearly proved that the telephone services belonged to "another." It was not Ms. Grijalva's telephone service.

Ms. Grijalva argues that the telephone service belonged to ICS, not the YCJ or the county's corrections department. However, that argument is a statutory irrelevancy. Whenever the State undertakes to prove an extraneous element, that element becomes the law of the case when it is included in a jury instruction; an appellate court's sufficiency review must thus include the additional element. *State v. Hickman*, 135 Wn.2d 97, 101-05, 954 P.2d 900 (1998). Assuming that the same doctrine applies in a bench trial, the question then would become whether the prosecutor attempted to prove that the victim's identity as an element of the case. That did not happen here. Both ICS and YCJ were identified as the entities that would lose revenue from the free telephone calls, but the prosecutor never included either of them as elements of his case.

Neither of Ms. Grijalva's arguments are persuasive. The State proved its case, and the trial court entered a series of powerful findings detailing Ms. Grijalva's knowledge of the use of the free telephone call system by Ms. Scribner and her friends, as well as her assistance to their use of the system. She clearly was an accomplice to their actions. She

was captured on quite a few of the recordings and knew what Ms. Scribner and her friends were using the free telephone calls to discuss. None of them involved legal business, and none of the recorded calls involved her clients in any manner. She allowed a friend to circumvent the ICS system in order to save money, thus costing ICS and the county over $2,000 in lost revenue. This was theft by any stretch of the imagination.

The evidence amply supported the bench verdict on the charge of second degree theft.

*Introduction of Contraband.* Ms. Grijalva also challenges her conviction for third degree introduction of contraband. While we have some sympathy for her position, we nonetheless have to conclude that the evidence supported the verdict.

A person commits third degree introduction of contraband when she "knowingly and unlawfully provides contraband to any person confined in a detention facility." RCW 9A.76.160(1). "Contraband," in turn, is defined as a "thing which a person confined in a detention facility is prohibited from obtaining or possessing by statute, rule, regulation, or order of a court." RCW 9A.76.010(1). The amended information charged Ms. Grijalva with providing "contraband, a cellular phone, to a person in a detention facility." CP at 10.

Ms. Grijalva argues that she was permitted, as an attorney, to bring a cell phone into the jail, and that professional visitors such as attorneys were permitted to bring cell phones with them to the jail. She notes that the jail changed its policy for professional

10

visitors and expressly prohibited cell phones *after* this incident. Her arguments, however, miss the mark. She was not charged for bringing her cell phone into the jail. She was charged—and convicted—for lending it to an inmate. The policy governing professional visitors is not apropos.

Instead, the question was whether cell phones were contraband when possessed by an inmate. The testimony at trial, reflected in finding of fact 11, indicated that there was "much signage in the Yakima County Jail that forbids cell phones in secure areas." CP at 68. From that fact the court inferred that Ms. Grijalva had knowledge that inmates were not permitted cell phones. Although Ms. Grijalva challenges finding 12, it is certainly a reasonable inference from the evidence. A regular visitor to the challenge would necessarily be on notice that inmates could not have cell phones.[4]

Additionally, Ms. Grijalva recognized her mistake right after she made it and acknowledged the error to jail personnel. From this evidence, the trial court could properly conclude that cell phones were contraband when possessed by inmates and that Ms. Grijalva knew that fact. Accordingly, the conclusion that she knowingly introduced contraband was supported by sufficient evidence in the record.

Although we uphold the conviction for third degree introduction of contraband, we do question the decision to file charges in these circumstances. Ms. Grijalva dialed the

---

[4] Indeed, the existence of the ICS phone system that Ms. Grijalva worked to bypass was additional evidence that she knew inmates were not permitted to have personal telephones.

telephone number herself and passed the phone for a brief conversation between Mr. George and his mother. The phone was promptly returned and there was no danger of some other contraband being passed along at the same time. The incident occurred in the view of jail personnel. This violation was *de minimis* and hardly seems worth the effort to prosecute it as a crime when there were other measures available to ensure no future violations by Ms. Grijalva.

The evidence supported both bench verdicts.

*Financial Obligations*

Ms. Grijalva also challenges the inclusion in the judgment and sentence form of a standard paragraph stating that she had the means to pay the costs of incarceration and listing the rates. CP 77 (¶ 4.D.4). Her argument that this finding is not supported by the record fails for two reasons.

First, she did not raise this issue at the trial court where it could have easily been addressed and, if necessary, corrected. These types of challenges cannot be presented for the first time on appeal. *State v. Duncan*, 180 Wn. App. 245, 327 P.3d 699 (2014). Second, she has presented no evidence that the incarceration costs apply to people, like her, whose entire sentence has been converted to community service. On this record, it does not appear that she potentially owes any money for serving a term of community service.

No. 30032-3-III
*State v. Grijalva*

For both reasons, this final challenge also fails.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Brown, A.C.J.

13

No. 30032-3-III

FEARING, J., (dissenting in part, concurring in part) — Attorney Kimberly Grijalva acted inappropriately. She may have even committed a crime. But she did not commit the crime of theft. Inappropriate or excessive use of a donated good or service is not theft. Therefore, I dissent from the affirmation of the conviction of Grijalva for second degree theft.

## FACTS

The facts behind this appeal lend themselves to a Coen brothers movie. A band of transgressors beat the system, one woman played the field with unending boyfriends, a recording device caught inane conversations, authorities legitimately worried about a dangerous criminal enterprise being conducted from inside a jail, and no one was harmed except a lawyer who lost her professional license by befriending the misfeasors.

The Yakima County Jail housed pay phones for use by jail inmates. Each jail housing unit retained at least two phones. Inmate Calling Solutions (ICS), a subcontractor of Yakima County, owned all phone hardware, operated the phone system, maintained the system, and charged for use of the phones. The phones operated from 5 a.m. to 11 p.m. ICS recorded each call.

Yakima County Jail inmates could use the pay phones by remunerating ICS $2.50 for each 15-minute call. An inmate, when calling, responded to an automated operator by entering his identification number and password. ICS required payment in advance and either the inmate or someone on behalf of the inmate could pay by a charge upon a credit card. In the alternative, the inmate could make a collect call, in which event the recipient's phone company was billed for ICS's charges. An ICS trial witness conceded that some recipients of a collect call never pay for the call. The witness was unaware of any legal action taken by ICS to collect an unpaid bill. ICS equally split telephone call revenue with the Yakima County Department of Corrections.

ICS generously established a program whereby jail inmates could use a pay phone for free to call a lawyer. A lawyer could register her phone number with ICS to receive the calls. If the inmate called the attorney's registered phone number, ICS did not charge for the call and did not record the call. Each call was limited to 15 minutes, but the inmate could recall the attorney number immediately upon the expiration of a call.

The Yakima County Office of Assigned Counsel assisted attorneys to register for free calls with ICS, since the jail was not responsive to attorney requests. The office of assigned counsel deemed an attorney qualified for the free service if the attorney was licensed and had contact with jail inmates. According to Dan Fessler, director of the office, the office did not anticipate calls for personal use or to someone living in an attorney's home.

2

Attorneys registering with the free jail phone system signed no agreement. The State presented no evidence of any established policy precluding use of the free phone system for personal use. Yakima County Sheriff Deputy Chad Peterschick testified to the lack of any terms or conditions imposed upon an attorney for receipt of the free calls. Peterschick assumed attorneys signed an agreement to participate in the fee phone call arrangement. He attempted to find an agreement, but found none.

Kimberly Grijalva worked as an attorney in Yakima. Much of her practice was criminal defense. In May 2009, Grijalva moved her law office from downtown Yakima to her rural Selah home. She then served as a public defender with a county contract to represent parents in dependency cases. The contract lasted through July 2010. She also performed public defense work in juvenile, municipal, and superior court. She had private criminal clients. Her dependency cases and other workload caused her presence in court most days, and often all day long.

Kimberly Grijalva registered as an attorney for the free, unrecorded phone calls from Yakima County Jail inmates. She met the requirements of the office of Assigned Counsel. In May 2009, when Grijalva moved her office to her home, she changed registration of the phone number to her home number. Inmates could call her office landline phone, at Grijalva's home, at number (509) 697-xxxx. Paying criminal clients called her from jail. The State presented no evidence that Kimberly Grijalva had contact

3

with Yakima County when registering for the phone calls, let alone that Yakima County needed to consent to her participation in the program.

In late 2009, Kimberly Grijalva learned from a client in jail that he could not call her free from the jail. Grijalva then gained Dan Fessler's help to restore the service. She learned thereafter that service to her line was interrupted again and solicited Fessler's help. The registration of the phone line was again restored on April 21, 2010.

In April 2010, Kimberly Grijalva paid ICS $25.90 for registration for attorney calls from the Yakima County Jail. The State provided no testimony that ICS demanded of Grijalva that she accept free phone calls only for attorney-client conversations or that she preclude free calls from being forwarded to another phone number. ICS never contacted Kimberly Grijalva to inform her of any limits on use of the line.

Kimberly Grijalva met state witness Autumn Scribner Hubbard through Bradley McCord. McCord was the adopted brother of Luis Gonzalez, Grijalva's deceased fiancée. In January 2010, McCord and Scribner moved into Grijalva's rural Selah home. McCord had just been released from federal prison. Autumn Scribner brought with her a four-year-old son, Marshall. The three stayed in an upstairs bedroom. Grijalva's teenage son, Kirk Cross, also resided at the Selah home.

According to Kimberly Grijalva, she did not permit Autumn Scribner use of her home's landline business phone. She allowed Brad McCord to use the phone so his probation officer could call to a phone that rang in the house. Grijalva told McCord and

4

Scribner that, if either must answer the business phone because of a recognizable phone number, he or she can answer the line but always answer "law office."

Kimberly Grijalva maintained four cell phones under a family plan. Grijalva used one of the cell phones. She gave one phone to her son, one to her stepson, and one to a friend. When the friend returned the phone, Grijalva gave Autumn Scribner the phone, with the number (509) 910-xxxx, to use while Scribner lived in Grijalva's residence.

Each cell phone, except Kimberly Grijalva's personal phone, faced limited monthly minutes of 1,400 or 1,500. If one of the phones exceeded the maximum, the phone company assessed Grijalva an outrageous minute charge. Autumn Scribner exceeded the limit each month she used the cell phone. Grijalva demanded that Scribner keep her phone minutes under the maximum, but Scribner's assurances went unavailing. Grijalva told Scribner to text instead of calling since the phone garnered unlimited texting.

In January 2010, and through the relevant events, Autumn Scribner was married to Dustin Hubbard. She dated and lived with Bradley McCord until March 2010, when McCord entered the Yakima County Jail on charges of unlawful possession of a stolen firearm, manufacture of controlled substances, and possession of controlled substances with intent to deliver.

In March 2010, Autumn Scribner began a dating relationship with Matthew Cornell. The two met at Work Source, where Scribner frequented because of her need to apply for jobs to continue receiving unemployment compensation. Cornell frequented Work Source because he was on work release from the Yakima County Jail. The two kissed the day they met, and the relationship turned sexual within two or three days. Scribner told Cornell that she had ended her relationship with Brad McCord, but Cornell later discovered Scribner's statement to be false.

For weeks, Autumn Scribner took Matthew Cornell to "old drug houses" to have sex, rather than actively look for work. Report of Proceedings (RP) at 535-36. In mid to late April 2010, Yakima County returned Cornell to jail because of his violation of work release conditions by engaging in sex.

Upon being jailed, Matthew Cornell began calling Autumn Scribner's cell phone borrowed from Kimberly Grijalva. The calls became expensive. Cornell and Scribner talked extensively about how they were running out of money for making calls to the cell phone. These calls to the cell phone were recorded.

The trial court aptly described the recorded conversations between Matthew Cornell and Autumn Scribner as inane and devoid of content. The trial court commented:

> But what was remarkable about the phone conversations that I heard and that can be inferred occurred for over a month, is how inane they were. Cornell and Scribner and presumably McCord and Scribner spoke for days on the phone, speaking about nothing. There was zero intellectual content.
> Mr. Cornell would say from the jail, I love you, and Autumn Scribner would say back, I love you, too. Mr. Cornell would say, I love

6

you so much I tattooed your name on me—my body, and Ms. Scribner would say, oh, you shouldn't have. And that kind of thing went on interminably, and that was what they were discussing.

RP at 847-48.

On April 21, 2010, Matthew Cornell began to call Kimberly Grijalva's free home office line, rather than Autumn Scribner's cell phone. According to Grijalva, Cornell and Scribner knew and decided on their own to place calls to Grijalva's office phone in order to save money. Autumn Scribner insisted that Grijalva notified the two of the ability to call her office phone for free and that Grijalva encouraged the use of the phone. The trial court found that Autumn Scribner was not sophisticated enough to arrange for the free calls.

Matthew Cornell testified that Autumn Scribner directed him to call Kimberly Grijalva's office phone. Scribner gave Cornell the phone number. Cornell does not believe Grijalva was present during this conversation. He followed Scribner's directions and learned to his surprise that calls were free.

In one recorded call on April 22, 2010, to Autumn Scribner's cell phone, Matthew Cornell said to Scribner, "I can call Kim's office free. . . . She don't need no code or nothing." RP at 209, 214. The trial court found that Kimberly Grijalva lingered in the background and occasionally participated in this April 22 call. The trial court also found that the familiarity of Grijalva with Cornell and Scribner during recorded conversations

7

on Scribner's cell phone belied Grijalva's claim that she did not participate in arranging for the free calls.

The State played the April 22 recording, upon which the trial court relied, during the testimony of Matthew Cornell. Cornell recognized Autumn Scribner's voice and his voice on the recording. He did not hear Kimberly Grijalva's voice. A transcript of the recording reads:

> MS. HUBBARD [SCRIBNER]: It's their office phone, but, yeah. I guess they might have set your inmate calls up, Ms. Grijalva. Yeah. She said you could try it and see if it works. I mean, but usually they'll go, oh, you need bla-bla-bla-bla, debit cards and da-da-da and yada-yada yada.

RP at 552.

The following colloquy occurred between the State's counsel and Matthew Cornell after the playing of this recording:

> Q At that point it had been set up as free? Okay. Now, who does it sound like she [Autumn Scribner] was talking to in the background?
> A She was saying Ms. Grijalva.
> Q Okay. Do you think—
> A I didn't—I didn't hear Kim's voice.
> Q You didn't hear Kim's voice?
> A No.
> Q Well, maybe we can move a little farther into the call. Do you recognize Kim's voice?
> A I would if I heard it.
> Q Okay. This may not be real clear for you, but.

RP at 553.

The prosecutor played more of the April 22 recording for Matthew Cornell. Cornell still did not identify the voice of Kimberly Grijalva. Remarkably, the State

8

played a passage from the recording twice for Cornell, but the trial transcript identifies

Kimberly Grijalva as a speaker during the first playing, but then states the speaker is

unidentified during the second airing:

> MR. CORNELL: (inaudible)?
> MS. HUBBARD [SCRIBNER]: Like he said, lied to me earlier,
> don't you do it, motherfucker.
> *MS. GRIJALVA*: He can lie to me.
> MS. HUBBARD: He can't lie to me.
> MS. UNIDENTIFIED: (Inaudible).
> MS. HUBBARD: I gotta call his mom.

RP at 554. (emphasis added).

The later playing of the same section is transcribed as:

> MR. CORNELL: Don't lie to her?
> MS. HUBBARD: Like he said, lied to me earlier, don't you do it,
> motherfucker.
> *MS. UNIDENTIFIED*: He can lie to me.
> MS. HUBBARD: He can't lie to me.
> MS. UNIDENTIFIED: Why? He can (inaudible).
> MS. HUBBARD: I gotta call his mom, though; right?

RP at 555 (emphasis added). Kimberly Grijalva testified she had no recollection of being

present or overhearing the April 22 recorded call.

Someone programmed Kimberly Grijalva's office phone to permit forwarding of

calls to Autumn Scribner's cell phone. Grijalva denied programming the landline phone

to forward calls to Scribner's phone. Autumn Scribner testified that Grijalva knew and

performed the tasks needed to program the forwarding of calls to the cell phone. Scribner

admitted, however, that she knew how to program call forwarding. The trial court found that Grijalva performed the task.

During the testimony of Kimberly Grijalva, the State played another recording from April 22, 2010:

> MALE VOICE: Call number.
> FEMALE VOICE: 11163xxxx.
> MALE VOICE: Date.
> FEMALE VOICE: 2010, 4/22.
> MALE VOICE: Time.
> FEMALE VOICE: 20:44:55.
> MALE VOICE: Dialed number from Station.
> FEMALE VOICE: 2410. Press one for English. Please enter your PIN number, followed by the pound sign. After the tone, please say United States.
> MALE VOICE: United States.
> FEMALE VOICE: Thank you. Press zero to make a collect call— for calls within the—please stand by.
> Hello, you have a prepaid call from—
> MR. CORNELL: Matthew Cornell.
> FEMALE VOICE: —an inmate at Yakima County Department of Corrections. Your account balance is $9. To hear the charges for this call, press two. To accept this call, press five. To refuse this call, hang up now. This call will be recorded and subject to monitoring at any time. Thank you for using IC Solutions. You may begin speaking now.
> MS. HUBBARD [SCRIBNER]: Hello?
> MR. CORNELL: (Inaudible).
> MS. HUBBARD: Hi, baby. Yeah, we don't have a call forwarding, but Ms. Grijalva's going to change it.
> MR. CORNELL: You don't have call forwarding?
> MS. HUBBARD: No, uhm, no. Marci, say (inaudible) go home. (Inaudible) went home.

RP at 648-49. Kimberly Grijalva testified that she never spoke to Autumn Scribner about call forwarding.

10

An April 22, 2010, recording between Autumn Scribner and Matthew Cornell implies Scribner was adept at call forwarding:

> MS. HUBBARD [SCRIBNER]: . . .who the fuck is Erica? (Inaudible), like, having to fuck with her.
> MR. CORNELL: Hey, she couldn't figure out how to do a call forwarding or a motherfucking three-way, man.
> MS. HUBBARD: (inaudible).
> MR. CORNELL: And when I told her to call you, you—you were supposed to tell her how to do a call forwarding and I was going to call you.
> MS. HUBBARD: She didn't ask me. I already told her, it's easy, star seven two or star seven three plus the number, and then you fucking wait till they answer the phone, then you hang the phone up. It's gonna ring one time on your end. Don't pick it up and don't touch it after, like, a minute or two so it can get accepted. That's all you do.
> MR. CORNELL: Yeah.
> MS. HUBBARD: And then to pull it back on star seven two or star seven three, whatever's the opposite number of whatever you forwarded it was.
> MR. CORNELL: I knew you knew.

RP at 206.

With call forward activated, Kimberly Grijalva's law office phone rang once and then the call transferred to Autumn Scribner's cell phone. Scribner then spoke on the phone no matter her location. Scribner claimed Grijalva answered some of the calls forwarded to Scribner's cell phone. Matthew Cornell testified that Grijalva may have answered his call once, but Grijalva did not hand the phone to Scribner on that occasion. Cornell called the office phone on several occasions to gain legal advice from Grijalva.

In a recorded April 22, 2010, conversation with Matthew Cornell, Autumn Scribner remarked:

11

MS. HUBBARD: I can be answering her [attorney Grijalva's] telephone like her secretary anyway because I'll probably (inaudible) employment (inaudible) over. She's always in court, motherfucker.

RP at 654. Kimberly Grijalva did not hear this telephone conversation but testified that she several times heard Autumn Scribner claim to be her secretary. Grijalva told Scribner she was not her secretary and instructed Scribner not to answer her office phone. Grijalva insisted that she never employed Autumn Scribner.

According to Kimberly Grijalva, one day her son's cell phone did not work, so she called the son on the home business line. The phone call went to Autumn Scribner's cell phone. Grijalva asked Scribner if she was at home and she said no, she forwarded calls to her cell phone that day. Grijalva told Scribner never to do that. Scribner informed Grijalva that she could be Grijalva's secretary. Grijalva replied that Scribner was not her secretary and that Scribner must not answer the business phone.

Matthew Cornell sensed Autumn Scribner to be "sneaky" when talking on the phone. RP at 545. According to Cornell, Scribner was either hiding from Grijalva or Scribner's boyfriend, Bradley McCord. Scribner sometimes went outside the home and into the cold to talk on the phone. If she remained inside, she went to her room or the laundry room. Scribner sometimes told Cornell that she needed to hurry home to deactivate the call forward function on the office phone. If he called in the morning, Scribner told Matthew Cornell to call again after Kimberly Grijalva left the house.

12

In mid-May, Autumn Scribner ended her relationship with Matthew Cornell. Cornell was crushed. He concluded that he was no longer of any use to Scribner since he remained in jail.

Autumn Scribner reignited her relationship with Bradley McCord, who occupied a jail cell adjacent to Cornell. McCord told Matthew Cornell to cease calling Scribner. McCord then nightly called Autumn Scribner on Kimberly Grijalva's office line. McCord considered the office line to have been his home phone line, since he previously occupied the home. At trial, McCord recalled that, when he called the home phone, Kimberly Grijalva once answered the phone and handed the phone to Autumn Scribner. Sometimes he called the line to ask Grijalva for legal advice.

Kimberly Grijalva claimed not to know of the many phone calls arriving at her home office phone. She testified that she would not always hear the business phone ring from other areas of the home. The trial court found her testimony incredible because of the many calls. The trial court concluded Grijalva must have known of the calls because of the constant ringing of her office phone and Autumn Scribner's use of her cell phone while inside Grijalva's home.

Autumn Scribner testified that Kim Grijalva was present during about half of her phone calls from Matthew Cornell. Grijalva agreed that she frequently heard or saw Scribner speaking on Scribner's cell phone, but did not know calls had been forwarded from the office phone. On one occasion, according to Scribner, Grijalva spoke to Cornell

13

on the office phone about the nature of bail jumping. Grijalva testified she spoke to Cornell on the subject after Cornell called Scribner's cell phone. Scribner handed her the cell phone. A recording confirms that the call was a paid call made directly to the cell phone.

For a period of several months, while Kim Grijalva's car was in the repair shop, Autumn Scribner provided Grijalva with transportation. During these car trips, Scribner was on the phone with inmates from the jail. The trial court found that Grijalva knew of the phone calls from jail because of these rides. Kimberly Grijalva testified that Scribner spoke on the phone during trips, but she was unaware of Scribner receiving calls from the jail. Scribner drove Grijalva to work in the morning and Grijalva assumed that Scribner spent the rest of the day looking for employment. According to Grijalva, she did not pay attention to Scribner's talking on the phone and often distracted the attention of Scribner's young son, who sat in the car during the calls, because of Scribner's foul mouth.

Autumn Scribner is the sister-in-law of Mindy Roberts' husband. Roberts' husband was also in the Yakima County Jail in early 2010. Scribner told Roberts her husband could call Kimberly Grijalva's office line and Scribner would arrange a three way call with Roberts. Roberts occasionally called Kimberly Grijalva's office line to speak to Grijalva about her husband's case. Autumn Scribner answered the phone and stated she would leave a message for Grijalva. Grijalva never called back.

14

Jeffrey Ochoa, another Yakima County Jail inmate, testified at trial. He considers Bradley McCord his best friend, and, like McCord, he violated federal probation. While in jail, Autumn Scribner wrote Ochoa a letter offering to perform a favor by connecting him to a friend free of charge if he called Kimberly Grijalva's office line. The letter directed him to call during limited times so that Grijalva would not learn of the call. Jeffrey Ochoa ended his friendship with Scribner when she made a sexual gesture towards him. Records showed that Ochoa called Grijalva's business line four times. Ochoa considers Kimberly Grijalva as a mother, since she assisted him and provided him a place while on probation.

David Cross, Kimberly Grijalva's son, testified that Autumn Scribner remained at the home most of the time in April and May. Scribner stayed in her room and spoke on the cell phone. When Scribner drove Cross to town she spoke on her cell phone. Cross never saw Scribner use the home office landline. He heard the landline ring occasionally during business hours and assumed the calls went to voice mail. According to Cross, his mother vacated the home during business hours. On more than one occasion, according to Cross, his mother returned home after work and complained about the landline being lost. Autumn Scribner then miraculously found the landline.

In May 2010, United States Bureau of Alcohol, Tobacco and Firearms Agent, Joel Miller, investigated the conduct of Bradley McCord for undisclosed federal crimes. During the investigation, McCord sat in the Yakima County Jail. Agent Miller sought

Yakima County Jail phone records to discern recipients of phone calls from McCord. Corrections Officer Theresa Schuknecht accessed ICS calling records and the two discovered that McCord made many free, unrecorded calls to the phone number listed as Kimberly Grijalva's attorney line. Agent Miller also learned that attorney Grijalva did not represent Bradley McCord.

Because of the number of calls to Kimberly Grijalva's office line, Joel Miller and Theresa Schuknecht shared concern about the possibility of Bradley McCord quarterbacking a criminal enterprise from inside the jail. Miller, however, could not find any federal laws to have been violated and so he forwarded the information to Yakima County Sheriff Deputy Peterschick for investigation of possible state crimes. Yakima County law enforcement officers also held concern of a vast criminal enterprise employing the free attorney line to Kimberly Grijalva's office.

Law enforcement officers reviewed phone records of ICS. Officers also obtained a search warrant for telephone records of Kimberly Grijalva. The ICS records showed 916 calls placed to Grijalva's office phone from the jail between April 21 and June 4, 2010. If the inmates had paid for the 916 calls, the charges would have been $2,200. If uncompleted calls were included the total was 1,356 calls. Kim Grijalva's phone records showed that most of the calls from the jail were forwarded to the cell phone number of the phone used by Autumn Scribner.

16

Phone calls from the jail to Kimberly Grijalva's office phone, and, in turn, to Autumn Scribner's cell phone, came every day and most days entailed hours of talking. Matthew Cornell placed about two-thirds of the calls. Bradley McCord originated about one-third of the calls. During this time, Grijalva did not represent either Bradley McCord or Matthew Cornell on criminal charges. Grijalva did not wish to represent either of them because of their behavior.

Jacob Scribner, a cousin of Autumn Scribner, placed several of the phone calls from the jail. Eight other inmates, some allegedly criminal associates of McCord, called Grijalva's home landline between April 21 and June 4. The Yakima County Jail removed Kimberly Grijalva's landline phone number from the attorney call list on June 4, 2010.

A representative calling day was May 4, 2010. On that day, Matthew Cornell placed 46 calls between 7:54 a.m. and 10:00 p.m. Many of the calls lasted the entire 15-minute duration.

Kimberly Grijalva testified she never received a phone bill for the free jail line. She obtained no statement that would show how many calls were made to the free phone line. If she had learned of Autumn Scribner's use of the business phone, she would have ended the use. According to Grijalva, Scribner did not have free reign over the landline. She was not to use the phone at all. Scribner was not to forward the calls to her cell phone.

17

In July 2010, Kimberly Grijalva removed Autumn Scribner from the former's home for numerous reasons. Scribner never paid rent. Because of the high cell phone bill, Grijalva asked Scribner to return to her the cell phone. Scribner broke the phone instead. Autumn Scribner told Kimberly Grijalva she would help pay for food, but did not keep this promise. Scribner ignored her son, Marshall, and did not help with housework. Grijalva grew concerned that Scribner engaged in crime because she always had money despite not working. Grijalva's son, Kirk Cross, opened his bedroom door one day and observed Autumn Scribner engaging in sexual behavior with two men. Scribner brought men from Work Source to the home for rendezvous.

Autumn Scribner claims she left the hospitality of Kimberly Grijalva because a new boyfriend, Brian Fogler, was released from jail in August. Scribner testified she paid rent to Grijalva. Bradley McCord believed Autumn Scribner was evicted by Kimberly Grijalva for using the landline. He viewed the separation as "ugly." RP at 511.

A dispute arose between the Yakima County Department of Corrections and Kimberly Grijalva concerning a visit to the jail, by Grijalva with Bradley McCord. As a result, Grijalva wrote a letter to the jail on August 19, 2010:

> Dear Chief Kelley,
> I am in receipt of your memo regarding Bradley McCord. I am not the attorney of record for his criminal matter. However, I met with him regarding some civil legal matters.
> I appreciate your offer to use the standard inmate video visiting process, but I do not need to meet with Mr. McCord at any personal level. I'm a little offended that you would insinuate that I would abuse the professional visiting process.

18

> In the future, perhaps an inquiry as to the reason for the visit would be more appropriate than just assuming that I was there for a non-legal reason. I can understand the confusion, as one of Mr. McCord's previous visitors [Autumn Scribner] had access to my legal phone and was abusing the phone calls by forwarding the phone to her cell and speaking with him for long amounts of time. That issue has been remedied by *terminating her* and that will not happen in the future. I hope this clears up any confusion.

RP at 733-34 (emphasis added). The trial court found significance in the word

"terminating" and determined that Kimberly Grijalva had employed Autumn Scribner in

some capacity. Grijalva testified she used the word "terminating" to unequivocally tell

others that Autumn Scribner was not her secretary.

On November 10, 2010, at 7 a.m., approximately 15 law enforcement officers

from several departments wearing tactical gear arrived at Kimberly Grijalva's Selah

home to serve a judicially authorized search warrant. All officers had guns and some

carried assault rifles. Some wore flak vests. Grijalva and her son were present when the

officers arrived. Grijalva wore a robe, with no undergarments, when the officers arrived.

She was told she was under arrest, placed in handcuffs, and then escorted to one of the

officer's patrol vehicles. She claims the handcuffing led to her exposure, but officers

denied such. Officers searched her property for other people.

Law enforcement officers found no implicating evidence at the Selah home. The

officers rammed open the door to an outbuilding shop. Kimberly Grijalva did not

understand the purpose of the ramming and entry into the shop since the doors were

nailed shut when officers unexpectedly arrived.

19

PROCEDURE

The State of Washington charged Kim Grijalva with second degree theft, based on the free telephone calls made by the jail inmates. The theft count listed the Yakima County Department of Corrections as the victim of a theft of telephone services. The information read:

> On, about, during or between April 21, 2010 and June 4, 2010, in the State of Washington, you wrongfully obtained and/or exerted unauthorized control over property, telephone services, of a value exceeding $750.00 but not more than $5,000.00, which was not a firearm or a motor vehicle, belonging to Yakima County Department of Corrections, with intent to deprive Yakima County Department of Corrections of that property.

Clerk's Papers (CP) at 1. The theft count later was amended to add a theory of accomplice liability.

Kimberly Grijalva waived her right to a jury trial and the matter proceeded to trial before a visiting judge.

The State granted Autumn Scribner immunity from prosecution and she became the State's principal trial witness. Scribner claimed Chris Smith, a federal agent, encouraged her cooperation by warning her that her son would be taken from her by Child Protective Services (CPS) or sent to his father. Scribner has a conviction for possession of methamphetamine.

After the State rested and Kimberly Grijalva began her case, the State moved to amend its information again. The second amended information read that defendant "wrongfully obtained and/or exerted unauthorized control over telephone services of a

20

value exceeding $750." RP at 593. The information added Inmate Calling Solutions as a victim. The court initially granted the motion to amend and file the second amended information. Before closing argument, Kimberly Grijalva presented case law raising concerns about an amendment to the information after the State rested. The State withdrew its motion to file the second amended information and the trial court revoked the order approving the information.

The trial court found Kimberly Grijalva guilty as charged. The court expressly found that she aided Autumn Scribner and her boyfriends in circumventing the jail telephone policy, resulting in a loss to the jail of over $750. The trial court found that Grijalva knew the free calls were circumventing the Yakima County Jail's pay for calls policy. At trial, the State presented no policy, let alone written policy, regarding use of the free phone.

Kimberly Grijalva had no prior convictions. The court imposed a total sentence of 60 days on the two counts and converted that time to 480 hours of community service. Standard financial obligations were imposed, and the court also ordered restitution of $2,290, with $1,145 to ICS and $1,145 to the Yakima County Jail.

ANALYSIS

*Findings of Fact*

I first note that one of the trial court's findings of fact is not supported by the evidence. The trial court erroneously found in finding of fact 43 that attorney Kimberly

21

Grijalva encouraged and aided Autumn Scribner and her boyfriends to circumvent the "Yakima County [j]ail [p]hone policy." CP at 73. This observation is not critical to my dissent, but bolsters the reasoning behind the dissent.

An appellate court reviews a trial court's findings of fact to determine whether they are supported by substantial evidence. *State v. Dobbs*, 180 Wn.2d 1, 10, 320 P.3d 705 (2014). Substantial evidence exists only if there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994); *State v. Atchley*, 142 Wn. App. 147, 154, 173 P.3d 323 (2007). A finding of fact is clearly erroneous when, although there is some evidence to support it, review of all of the evidence leads to a definite and firm conviction that a mistake has been committed. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000); *State v. Lundy*, 176 Wn. App. 96, 105-06, 308 P.3d 755 (2013).

Finding of fact 43 is erroneous because there is no evidence to support a conclusion that the Yakima County Jail had any policy concerning use of the phone lines when calling attorneys. According to Dan Fessler, Director of the Office of Assigned Counsel, the Office did not anticipate calls for personal use or to someone living in an attorney's home. But an expectation does not constitute a policy. Black's Law Dictionary defines "policy" only in other settings. The lay dictionary defines "policy," in our context, as "a definite course or method of action selected from among alternatives and in the light of

22

given conditions to guide and usually determine present and future decisions."
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1754 (1993).

The State presented no evidence of even an oral policy concerning phone usage. The Yakima County Jail adopted no definite course of action for use of the phones. The State presented significant testimony and many exhibits with regards to jail policies for introducing contraband into the jail, but nothing regarding phone use. Yakima County Sheriff Deputy Chad Peterschick testified he knew of no terms or conditions imposed upon an attorney for receipt of the free calls. Officer Peterschick had assumed attorneys signed an agreement to participate in the fee phone call arrangement. He attempted to find an agreement, but found none.

The majority suggests I am confusing the possibility of a policy that extends to attorneys' use of the free line, when the trial court referred, in finding 43, to a policy inside the jail that applied to inmates' use of the free line. The majority then writes that there is evidence of an internal jail policy and it cites RP 787 for this purported fact. RP 787 comes from the closing statement of the State. A fundamental rule posits that an attorney's argument does not constitute evidence. *Green v. A.P.C.*, 136 Wn.2d 87, 100, 960 P.2d 912 (1998). Anyway, the page reference contains no mention of any jail policy concerning use of the phone. Exhibit 22 is the Yakima County Department of Corrections Inmate Handbook, which contains a section on telephone use. The handbook

23

section does not restrict the use of the attorney line. In short, no policy applied to attorneys or inmates as to the conduct of Kimberly Grijalva or those who called her line.

*Theft*

Although technically my dissent is based on insufficiency of evidence, the dissent is centered more upon a disagreement with the trial court's and the majority's view of the law, not the facts. Also, regardless of whether the jail promulgated a policy regarding phone usage, the evidence falls short of theft.

The State charged Kimberly Grijalva with second degree theft in violation of RCW 9A.56.040(1)(a). The Washington criminal code lodges a chapter on theft and robbery that lists degrees of theft by seriousness and subject matter and provides a maze of definitions through which one must wander to determine if particular conduct constitutes theft. Chapter 9A.56 RCW. The second degree theft statute reads:

> (1) A person is guilty of theft in the second degree if he or she commits theft of:
> (a) Property or services which exceed(s) seven hundred fifty dollars in value but does not exceed five thousand dollars in value, other than a firearm as defined in RCW 9.41.010 or a motor vehicle;

Terms in the statute are defined in other sections of the chapter. RCW 9A.56.020 declares:

> (1) "Theft" means:
> (a) To wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services; or

24

(b) By color or aid of deception to obtain control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services; or

. . . .

RCW 9A.56.010 contains many definitions applicable to the theft chapter:

The following definitions are applicable in this chapter unless the context otherwise requires:

. . . .

(10) "Obtain control over" in addition to its common meaning, means:

(a) In relation to property, to bring about a transfer or purported transfer to the obtainer or another of a legally recognized interest in the property; or

(b) In relation to labor or service, to secure performance thereof for the benefits of the obtainer or another;

(11) "Owner" means a person, other than the actor, who has possession of or any other interest in the property or services involved, and without whose consent the actor has no authority to exert control over the property or services;

. . . .

(15) "Services" includes, but is not limited to, labor, professional services, transportation services, electronic computer services, the supplying of hotel accommodations, restaurant services, entertainment, the supplying of equipment for use, and the supplying of commodities of a public utility nature such as gas, electricity, steam, and water;

. . . .

(21) Value.

(a) "Value" means the market value of the property or services at the time and in the approximate area of the criminal act.

. . . .

(c) Except as provided in RCW 9A.56.340(4) and 9A.56.350(4), whenever any series of transactions which constitute theft, would, when considered separately, constitute theft in the third degree because of value, and said series of transactions are a part of a criminal episode or a common scheme or plan, then the transactions may be aggregated in one count and the sum of the value of all said transactions shall be the value considered in determining the degree of theft involved.

25

For purposes of this subsection, "criminal episode" means a series of thefts committed by the same person from one or more mercantile establishments on three or more occasions within a five-day period.

. . . .

(22) "Wrongfully obtains" or "exerts unauthorized control" means:

(a) To take the property or services of another;

(b) Having any property or services in one's possession, custody or control as bailee, factor, lessee, pledgee, renter, servant, attorney, agent, employee, trustee, executor, administrator, guardian, or officer of any person, estate, association, or corporation, or as a public officer, or person authorized by agreement or competent authority to take or hold such possession, custody, or control, to secrete, withhold, or appropriate the same to his or her own use or to the use of any person other than the true owner or person entitled thereto; or

(c) Having any property or services in one's possession, custody, or control as partner, to secrete, withhold, or appropriate the same to his or her use or to the use of any person other than the true owner or person entitled thereto, where the use is unauthorized by the partnership agreement.

The State of Washington's amended information alleged that Ms. Grijalva:

acting as a principal or an accomplice, you or an accomplice wrongfully obtained and/or exerted unauthorized control over property, telephone services, of a value exceeding $750 but not more than $5,000, which was not a firearm or motor vehicle, belonging to Yakima County Department of Corrections, with intent to deprive Yakima County Department of Corrections of that property.

CP at 10.

In the context of the prosecution of Kimberly Grijalva, the State of Washington needed to prove Grijalva: (1) wrongfully obtained or exerted unauthorized control over (2) the property or services of another or the value thereof, (3) with intent to deprive him or her of such property or services, (4) between $750 and $5,000 in value. The State's proof failed for at least two reasons. Kimberly Grijalva did not wrongfully obtain or

26

exert unauthorized control over property or services. Property or services of "another" means the property or services of the "owner" as alleged by the State, and Grijalva took no property or services of the alleged victim, Yakima County. She took no property or services even from the owner of the phone system, ICS.

*Owner*

For purposes of theft, the meaning of "property of another" is derived from the definition of "owner." *State v. Pike*, 118 Wn.2d 585, 589, 826 P.2d 152 (1992); *State v. Lau*, 174 Wn. App. 857, 868, 300 P.3d 838 (2013). The definition of "owner" "establishes the level of interest necessary to claim a right to property." *Pike*, 118 Wn.2d at 589. To repeat from above, "owner" means a "person, other than the actor, who has possession of or any other interest in the property or services involved, and *without whose consent the actor has no authority to exert control over the property or services.*" RCW 9A.56.010(11) (emphasis added). Critical to our discussion is the last clause of the definition.

To constitute the property of another person, the item must be one in which another person has an interest, and the defendant may not lawfully exert control over the item absent permission of that other person. *State v. Joy*, 121 Wn.2d 333, 340-41, 851 P.2d 654 (1993); *State v. Jacobson*, 74 Wn. App. 715, 719, 876 P.2d 916 (1994). Kimberly Grijalva gained access to the free phone program through ICS. She did not seek and did not need approval from Yakima County. At least, the State presented no

27

testimony that Grijalva needed permission from county authorities. Yakima County took action, on June 4, 2010, to end Kimberly Grijalva's participation in the program, but it does not follow that initial permission was needed from the county.

The State might argue that RCW 10.37.090 applies and that it need not have correctly identified the victim in the information. The statute reads:

> When the crime involves the commission of, or an attempt to commit a private injury, and is described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured or intended to be injured is not material.

I need not address whether the statute, which limits itself to "private injury," applies when the State alleges the theft of government property, because of other circumstances in this case.

After the State rested, it sought to amend its information to allege ICS, in addition to Yakima County, was the victim of the theft. The court granted the motion to amend, but the State later withdrew the motion when the court cautioned the State that the ruling might be erroneous based upon case law and prejudice to Kimberly Grijalva. Indeed Grijalva's counsel may have conducted additional discovery and asked other questions if he knew the State contended ICS was a victim. The State's limitation of the victim to Yakima County should be fatal to the theft prosecution.

In *State v. Lee*, 128 Wn.2d 151, 904 P.2d 1143 (1995), the Supreme Court reversed a conviction and dismissed charges of second degree theft. Although other grounds supported the dismissal, the court based the decision, in part, upon the ground

28

that the purported victim was one other than the victims listed in the information. The court noted that:

The name of the victim, however, is not superfluous in a theft case, as the court of appeals correctly observed. Though not a necessary element of a theft instruction, allegations of ownership must be sufficiently stated in an information to establish that the property was not that of the accused, to protect the accused against a second prosecution for the same crime, and to avoid misleading or embarrassing the accused in the preparation of his or her defense.

128 Wn.2d at 159.

*Property*

In conflict with the majority's decision, the State argues that Kimberly Grijalva took property, not services, of another. The State admits that ICS owned the phone equipment and even the phone services. The State argues that Yakima County was a victim because it did not receive revenue it would have otherwise received. But the State forwards no case that allows conviction of an accused because a non-owner of property or services did not receive the income it desired.

"Property" is not defined in chapter 9A.56 RCW, but is expansively defined for the entire criminal code as "anything of value, whether tangible or intangible, real or personal." RCW 9A.04.110(22). Money is property. *State v. Morris*, 109 Wash. 490, 187 P. 350 (1920). But property has not been determined to be prospective income.

To be guilty of theft in the second degree, the accused must "wrongfully obtain" or "exert unauthorized control" over property of another. RCW 9A.56.020. In turn, for

29

one to "wrongfully obtain" or "exert unauthorized control" over property, one must take possession or custody of the property. RCW 9A.56.010(22). One party might exert control over future income of another through an assignment of income or an encumbrance on the income. Kimberly Grijalva never obtained or controlled Yakima County's prospective income.

Prospective income fits awkwardly into a statutory scheme whereby one obtains property from another. In criminal cases, fairness dictates that courts should refrain from using possible but strained interpretations of statutes. *State v. Garcia*, 179 Wn.2d 828, 837, 318 P.3d 266 (2014); *State v. Bell*, 83 Wn.2d 383, 388, 518 P.2d 696 (1974).

*Wrongfully Obtain or Unauthorized Control*

Although the State charged Kimberly Grijalva alternatively with wrongfully obtaining and unauthorized control over property, the State does not argue that Kimberly Grijalva intended to use the free phone service for personal use by others when she registered for the program. Thus, the State must argue that Grijalva asserted unauthorized control over the program after she rightfully obtained participation in the program. Yet the State presented no testimony that participation in the program was conditioned upon refraining from any personal calls.

The director of the Office of Assigned Counsel testified that he or his office did not anticipate personal calls on the free line. But he did not testify that this anticipation was communicated to Kimberly Grijalva. There was no agreement with Grijalva limiting

30

the purpose of phone calls. If unauthorized use of a service or property ripens into a crime, at the least there should be some express agreement between the user and owner of the service as to what use is not authorized. Preferably there should be a written agreement between the parties.

Unauthorized control over property is generally labeled as "embezzlement." *Joy*, 121 Wn.2d at 335. I question whether a court has ever considered unauthorized phone calls during participation in a free phone program as embezzlement.

An enlightening decision is *State v. Joy*, 121 Wn.2d 333. The jury convicted defendant Kenneth Joy of five counts of theft, alternatively charged as theft by color or aid of deception and theft by exertion of unauthorized control over funds paid him by homeowners for contracting work. The five charges arose out of contracts between Joy and five unrelated homeowners for repair work. Joy obtained substantial advance payments from each owner and then never completed the work. Joy returned none of the advance payments. Joy specifically promised three of the homeowners that he would purchase material for their respective homes with the advance payment. The promise lay in written contracts with two of the owners. Joy made no promises to two of the homeowners that he would apply the advance payment to materials for the respective homes. Those homeowners anticipated, however, that their respective payments would be used for purchase of material for their respective homes.

31

The *Joy* court stated the issue at hand was whether the owners had an interest in the money paid so as to meet the definition of "property of another," and whether defendant appropriated that property to his own use, contrary to agreements authorizing defendant to hold possession of or control the money. The court reasoned that, if the particular agreement between the owner and defendant restricted the use of the funds to a specific purpose, the owner would have an interest in the money, *i.e.,* the application of the money to the purpose for which it was entrusted to defendant. The court based this proposition upon W. LAFAVE & A. SCOTT, CRIMINAL LAW § 89, at 648 (1972), which read that embezzlement may occur when a contractor appropriates money, paid in advance on a contract, which is earmarked to be used only for a construction purpose. The *Joy* court upheld convictions of the three charges based upon agreements with owners that advance payments would be used to purchase materials for the contract work. The court reversed the convictions on the two remaining contracts in which Joy had given no express promise to use payment for purchase of materials. The court concluded that "the key is whether there was a restriction or limitation in the agreements giving the owners an interest in having the funds applied to the purchase of materials." *Joy,* 121 Wn.2d at 343.

One might argue that Kimberly Grijalva understood that free calls to her phone were to be based only on an attorney-client relationship. But contractor Kevin Joy had to have also understood that money paid to him by homeowners was meant to purchase

32

materials and pay for employees working on the respective homes. Understandings do not form the basis of theft.

A conviction in this case sets a dangerous precedent. A worker at a business may have access to a business phone, and the employer expects that the worker will not place a long distance call for personal use. The worker may have an emergency and make one or more calls long distance without reimbursing the employer. Under the majority's ruling, that worker is now subject to criminal charges. A worker may be given a company vehicle to drive with the employer expecting the worker to operate the vehicle only for business purposes. The employee may divert his path for five minutes to buy some groceries at a store. Under our ruling, that employee is now subject to criminal charges. Although these examples are not as extreme as the conduct of the Yakima County Jail inmates and Autumn Scribner, the principle remains the same that the workers exerted unauthorized control over the property of another because the worker's use of the property conflicted with the owner's expectations. A jail may have a policy that allows an inmate only one cup of coffee per day, but an inmate may sneak an additional cup on a particular day. Under our ruling, the inmate has committed theft by violating the jail policy.

The Yakima County Department of Corrections Inmate Handbook contains no policy restricting use of the attorney phone line. Assuming it did, the handbook contains

33

a disciplinary process for violations of the policies. Neither the handbook nor a statute renders a violation of a jail policy to be a crime.

Other problems arise with the conviction of Kimberly Grijalva. The two men, Matthew Cornell and Bradley McCord, who made almost all of the personal calls testified at trial. Although Kimberly Grijalva, rather than the State, called both to testify, the State could have, but did not, ask either if he would have continued to pay for a thousand dollars worth of phone calls if he was unable to call Kimberly Grijalva's business line. Each man's excessive use of the phone may suggest he would have continued to pay for calls. Nevertheless, Autumn Scribner's and Matthew Cornell's complaints about the cost of the calls may suggest the calls would have ended. The trial court entered no finding of fact that either Bradley McCord or Matthew Cornell would have paid for any more phone calls if there had not been a free line.

Whether ICS or Yakima County lost revenue because of the abetting by Kimberly Grijalva in the free phone calls is speculative. More speculative is whether any loss would have exceeded $750.

I concur in the majority's affirmation of the conviction on the charge of introducing contraband and with the majority's comments about the State charging Kimberly Grijalva with a crime for lending cell phone to a prisoner.

_____

Fearing, J.

34